**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **BOOTS OF OKLAHOMA, LLC, an Oklahoma corporation,** | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **No. 5:14-cv-2-M** |
| **ESSEX INSURANCE COMPANY,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT ESSEX INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Defendant, Essex Insurance Company ("Essex"), moves for partial summary judgment pursuant to Rule 56, Fed. R. Civ. Proc. and LCvR 56.1 of the Local Rules of the United States District Court for the Western District of Oklahoma. In support of its motion, Essex submits the following brief.

**5, ¶ 34 (Okla. 20INTRODUCTION**

**INTRODUCTION**

Plaintiff Boots of Oklahoma, LLC ("Boots") is the owner of a building occupied by Bikini's Sports Bar & Grill located in Oklahoma City. On March 16, 2013, the building was damaged by fire. At the time of the fire, the building was covered by commercial property insurance issued by Essex. Boots made claims for benefits under the policy's building and business income coverage.

Boots alleges that the cost to repair the damage to the building exceeds $700,000.00. Essex contends that total covered loss caused by the fire is approximately $585,000.00. On July 9, 2013, prior to reaching a determination as to the full amount of

loss, Essex made a $100,000.00 advance payment to Boots. In November 2013, after application of the deductible and accounting for the advance payment, Essex tendered the remaining $480,002.01. Boots never cashed this second check and never made a request for additional payment prior to the filing of this lawsuit.

The disparity in the parties' assessments of the amount of the loss comes from the parties' differing views of the scope of the damage caused by the fire. Boots contends all of the damage to the building was caused by the fire and its suppression. Investigation by an independent, consulting engineer revealed that Boots' contractor removed part of the roof in May 2013, which allowed rain to enter the building and cause substantial damage unrelated to the fire. The Essex policy covers damage caused by the fire, not damage resulting from the actions of Boots' contractor. While Essex denies that it has breached the insurance policy, the breach of contract claim is not the subject of this motion. Essex instead moves for partial summary judgment in its favor on Plaintiff's extra contractual claim that it breached its duty of good faith and fair dealing and a ruling that punitive damages are not warranted.

## STATEMENT OF UNDISPUTED FACTS

1. Essex issued a commercial insurance policy (the "Policy") to Boots with an effective policy period of October 30, 2012 to October 30, 2013. *See*, Petition, ¶ 5, attached hereto as Exhibit 1.

2. The policy concerned commercial real property located at 2747 West Memorial Road, Oklahoma City, Oklahoma (the "building"), which is owned by Boots

and leased to a commercial tenant. *Id.* at ¶ 6.

3. On or about March 16, 2013, the building was damaged by a fire. *See*, Oklahoma City Fire Department Report dated March 16, 2013, attached hereto as Exhibit 2.

4. The cause of the fire was undetermined. *Id.*

5. Essex received notice of the loss on March 18, 2013 and assigned the claim to Claims Service Representative, Harvey Goodman. *See*, Letter from Markel Service, Incorporated to Med James Inc. and Boots of Oklahoma, LLC dated March 19, 2013, attached hereto as Exhibit 3.

6. On this same day, Mr. Goodman retained Jim Longnecker of Johnson Claim Service as an independent adjustor. *See*, Time Sheet of Jim Longnecker, attached hereto as Exhibit 4 at Essex 1088.

7. Mr. Longnecker began adjustment of the loss, including an inspection of the building on March 19, 2013 and March 20, 2013. *See*, Johnson Claim Service, Inc.'s First Report dated March 22, 2013, attached hereto as Exhibit 5 (enclosures not included).

8. Susan Wiley, a managing member of Boots, and Jack Giles of Jack Giles Restaurant Designs, the contractor retained by Boots, were present during the March 20, 2013 inspection. *Id*.

9. From March 22, 2013 through May 8, 2013, Mr. Longnecker provided Essex with four reports. *See*, Exhibit 5; Johnson Claim Service, Inc.'s Second Report

dated April 10, 2013, attached hereto as Exhibit 6 (enclosures not included); Johnson Claim Service, Inc.'s Third Report dated April 29, 2013, attached hereto as Exhibit 7 (enclosures not included); and Johnson Claim Service, Inc.'s Fourth Report dated May 8, 2013, attached hereto as Exhibit 8.

10. These reports outlined Mr. Longnecker's initial scene analysis, the initial water damage caused by the Oklahoma City Fire Department, and Mr. Giles' initial all-encompassing repair estimate of $730,770.02.[1] *Id.*

11. On April 10, 2013, Mr. Goodman requested that Mr. Longnecker retain Rimkus Consulting, Inc. ("Rimkus") to perform a structural inspection of the building. *See*, Exhibit 4 at Essex 1092-1093.

12. Rimkus conducted its initial inspection of the building on May 10, 2013. *See*, Rimkus Consulting Group, Inc.'s Fire Damage Evaluation dated June 18, 2013, attached hereto as Exhibit 9.

13. On May 16, 2013, Mr. Giles decided to "start the tear off of the fire damaged overhang so the building could be secured." *See*, Exhibit 4 at Essex 1096.

14. The demolition of the building's overhang was completed on May 22, 2013. *Id.* at Essex 1097.

15. Rimkus performed another inspection of the building on May 23, 2013. This inspection revealed that Mr. Giles never secured the roof after his demolition. *See*,

[1] This estimate was a "lump sum" and "turnkey" type estimate, which included a portion of the repairs that were the responsibility of the Tenant's insurance carrier. *See*, Exhibit 8. This estimate did not take into account any applicable deductibles or replacement cost value holdbacks. *Id*.

Rimkus Consulting Group, Inc's Report of Findings dated July 1, 2013, attached hereto as Exhibit 10; Rimkus Consulting Group, Inc.'s Interim Report of Findings dated July 3, 2013, attached hereto as Exhibit 11; and Rimkus Consulting Group, Inc.'s Supplemental Report of Findings dated July 9, 2013, attached hereto as Exhibit 12.

16. A third inspection of the building was performed on June 7, 2013 by Rimkus, which discovered additional severe water damage to the building caused by the uncovered roof. *See*, Exhibit 10 at Essex 0606-0607; and Exhibit 12 at Essex 0633-0634.

17. Approximately fifteen inches of rain were recorded in Oklahoma County during May and June 2013. *See*, Exhibit 10 at Essex 0607. Specifically, on the evening of May 31, 2013 through the morning of June 1, 2013, approximately seven inches of rain fell across Oklahoma County. *Id.*

18. From May 30, 2013 through August 16, 2013, Mr. Longnecker provided Essex with an additional five reports. *See*, Johnson Claim Service, Inc.'s Fifth Report dated May 30, 2013, attached hereto as Exhibit 13 (enclosures not included); Johnson Claim Service, Inc.'s Sixth Report dated June 17, 2013, attached hereto as Exhibit 14 (enclosures not included); Johnson Claim Service, Inc.'s Seventh Report dated June 27, 2013, attached hereto as Exhibit 15 (enclosures not included); Johnson Claim Service, Inc.'s Eighth Report dated July 10, 2013, attached hereto as Exhibit 16 (enclosures not included); and Johnson Claim Service, Inc.'s Ninth Report dated August 16, 2013, attached hereto as Exhibit 17 (enclosures not included). These reports outlined Rimkus's reports and estimates, Mr. Giles' estimates, and noted the additional water damage

caused by the unsecured roof. *Id*.

19. On May 31, 2013, Ms. Wiley sent Mr. Longnecker a letter requesting coverage for lost rent under the business income coverage section of the Policy. *See*, Letter from Susan Wiley to Jim Longnecker dated May 31, 2013, attached hereto as Exhibit 18.

20. Ms. Wiley made a second request for an advance on June 3, 2013. *See*, Exhibit 4 at Essex 1097. Mr. Longnecker discussed this request with Mr. Goodman on June 4, 2013, and it was determined Mr. Longnecker would prepare a report suggesting an advance payment. *Id*. This report was provided to Essex on June 17, 2013. *See*, Exhibit 14.

21. On June 28, 2013, Essex authorized a $100,000.00 advance payment to Boots, which was picked up by Ms. Wiley on July 9, 2013. *See*, Markel Claim Review Summary dated June 28, 2013, attached hereto as Exhibit 19; and Exhibit 16.

22. Rimkus prepared two reports for Mr. Longnecker in July 2013. The first was in regards to the additional water damage caused by the roof's removal and the second in regards to the cause and origin of the fire. *See*, Exhibit 11, and Exhibit 12.

23. On July 24, 2013, Mr. Longnecker had a meeting with the Rimkus engineer, Ms. Wiley, and Mr. Giles concerning the additional water damage to the building. *See*, Exhibit 17.

24. Due to the variance in the parties' estimates, Mr. Longnecker used this meeting as an attempt to obtain an agreed scope of repairs. *Id*. As this meeting was

unsuccessful, a second was held on August 13, 2013 to discuss the lack of supporting documentation for Mr. Giles' revised estimate of $712,362.11.[2] *Id.* Although Mr. Giles provided additional documentation, a conflict still existed as to the cause of the additional water damage. *Id*.

25. Joe Leo of Leo & Dutton was retained by Essex on July 26, 2013 to review Ms. Wiley's claim for loss income. *See*, Exhibit 4 at Essex 1104, and E-mail from John Irwin to Harvey Goodman dated July 26, 2013, attached hereto as Exhibit 20.

26. On August 12, 2013, Mr. Leo advised Mr. Harvey that Boots' policy limit of $85,000.00 for loss of income provides Boots with coverage for 6 months and one week worth of lost rent income. *See*, E-mail from Joseph Leo to Harvey Goodman and Jim Longnecker dated August 12, 2013, attached hereto as Exhibit 21.

27. On July 25, 2013 Rimkus prepared a revised estimate to reflect the revisions from the original fire, repairs for water intrusion damage due to the roof opening, and for interior finishes which were deemed the responsibility of Boots' tenant. *See*, Rimkus Consulting Group, Inc.'s Report dated July 25, 2013, attached hereto as Exhibit 22. This was included in Mr. Longnecker's ninth report to Essex dated August 16, 2013. *See*, Exhibit 17.

28. Mr. Longnecker provided Essex with his tenth report on September 11, 2013. *See*, Johnson Claim Service, Inc.'s Tenth Report dated September 11, 2013,

[2] Mr. Giles' estimate reflected his interpretation of the discussions regarding the scope of damages during the July 24, 2013 meeting.

attached hereto as Exhibit 23. This included Mr. Giles' revised estimate of $707,460.40.[3] *Id*.

29. Based on the estimates provided by Mr. Giles and Rimkus, Mr. Longnecker provided a written estimate of $492,870.81. *Id.* This estimate was for an actual cash value amount, prior to the replacement cost value being paid, as required by the Policy.[4]

30. Taking into consideration Boots' losses of the building and business income, Boots' deductible and the $100,000.00 advance, Mr. Longnecker submitted the amount of $444,840.42 for Essex's consideration. *Id*.

31. On September 26, 2013, Mr. Goodman mailed Boots a Proof of Loss letter. *See*, Letter from Mr. Goodman to Boots of Oklahoma dated September 26, 2013, attached hereto as Exhibit 24.

32. The letter advised this amount did not include the depreciation holdback, which would be released to Boots after the completion of repairs per the replacement cost coverage. *Id.* Further, this letter notified Boots it was entitled to policy limits on its business income loss coverage. *Id*.

33. Mr. Longnecker presented Essex with his eleventh report on October 3, 2013. *See*, Johnson Claim Service, Inc.'s Eleventh Report dated October 3, 2013, attached hereto as Exhibit 25 (enclosures not included). This report noted the proof of

[3] Mr. Giles' estimate was prepared in response to the meeting held on August 13, 2013 and the available supporting invoices and estimates.

[4] The Policy provides that an initial actual cash value payment be made, followed by a replacement cost value, once proof of the repairs is provided. *See*, Exhibit 32 at Essex 1184 – Essex 1185.

loss and requested Mr. Goodman's authorization for a meeting with Ms. Wiley and Mr. Giles to discuss the differences between Mr. Giles' estimate and the proof of loss amount. *Id*. Mr. Longnecker received this authorization on October 4, 2013. He was also authorized to prepare a bid comparison worksheet to prepare for this meeting. *See*, E-mail from Harvey Goodman to Jim Longnecker dated October 4, 2013, attached hereto as Exhibit 26.

34. Mr. Longnecker provided this comparison in his Twelfth Report dated October 16, 2013 discussing the parties' different position on the scope of damages, specifically the additional water damage. *See*, Johnson Claim Service, Inc.'s Twelfth Report dated October 16, 2013, attached hereto as Exhibit 27 (including Bid Comparison Worksheet).

35. On October 16, 2013 and October 29, 2013, Mr. Longnecker presented Essex with his two final reports. *See*, Exhibit 27; and Johnson Claim Service, Inc.'s Thirteenth Report dated October 29, 2013, attached hereto as Exhibit 28 (enclosure not included). These reports acknowledged Boots' disagreement with his position regarding the additional water damage to the building. *Id*

36. Mr. Goodman issued a "due and owing" letter to Boots on October 31, 2013, which stated Essex would pay Boots $480,002.01, plus the depreciation that had been withheld from its September 26, 2013 calculation. *See*, Letter from Harvey Goodman to Boots of Oklahoma dated October 31, 2013, attached hereto as Exhibit 29. This letter stated "[a]cceptance and cashing of the check will not prejudice your rights

under the Terms and Conditions of the contract to pursue his claim for any additional sums you believe you are entitled to." *Id.* This letter further stated "if you, Mr. Giles or any of your repairers wish to present additional information for us to consider, [we] would be happy to review all aspects of this claim so you are satisfied with the final determination." *Id*.

37. On November 11, 2013, a check for $480,002.01 was issued to Boots. Despite being advised that cashing this check would not affect any additional claims, Boots never cashed the check. *See*, Check dated November 11, 2013, attached hereto as Exhibit 31.

38. Essex was served on December 12, 2013. *See*, Summons and Correspondence from John Doak, Insurance Commissioner, dated December 12, 2013, attached hereto as Exhibit 30. Prior to the filing of this case, Boots provided no additional information to Essex.

**ARGUMENTS AND AUTHORITIES**

Summary judgment is appropriate where the movant has established that "there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Thomas v. Avis Rent a Car*, 408 Fed. Appx. 145, 151 (10th Cir. 2011) (quoting *Hennagir v. Utah Dep't of Corr.*, 585 F.3d 1255, 1261 (10th Cir. 2009)). *See*, Fed. R. Civ. P. 56(a). "Judgment as a matter of law is appropriate when the nonmoving party has failed to make a sufficient showing on an essential element of his or her case with respect to which he or she has the burden of proof." *Koch v. City of Del City*, 660

F.3d 1228, 1238 (10th Cir. 2011) (quoting *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007)).

**PROPOSITION I**

**ESSEX DID NOT BREACH ITS DUTY TO**
**DEAL FAIRLY AND ACT IN GOOD FAITH.**

To succeed on a claim for bad faith, the plaintiff must make "a clear showing that the insurance company unreasonably and in bad faith withheld payment of the claim of the insured." *Pitts v. W. Am. Ins. Co.*, 212 P.3d 1237, 1240, 2009 OK CIV APP 64, ¶ 7 (Okla. Civ. App. 2009)). The central question in any bad faith claim is "whether the insurer had a good faith belief, at the time its performance was requested, that it had a *justifiable* reason for withholding payment under the policy." *Bailey v. Farmers Ins. Co.*, 137 P.3d 1260, 1264, 2006 OK CIV APP 85, ¶ 16 (Okla. Civ. App. 2006) (quoting *Newport v. USAAA*, 11 P.3d 190, 195, 2000 OK 59, ¶ 10 (Okla. 2000)). *See also, Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1093-94, 2005 OK 48, ¶ 28 (Okla. 2005) ("A central issue in any analysis to determine whether breach has occurred is gauging whether the insurer had a good faith belief in some justifiable reason for the actions it took or omitted to take that are claimed violative of the duty of good faith and fair dealing."); *Deunsing v. State Farm & Cas. Co.*, 131 P.3d 127, 137, 2006 OK CIV APP 15, ¶ 36 (Okla. Civ. App. 2006) ("Under Oklahoma law, bad faith cannot exist if an insurer's conduct was reasonable under the circumstances.").

The plaintiff must prove each of the following elements: "(1) the plaintiff's loss was covered under the insurance policy issued by the insurer; (2) the insurer's refusal to pay the claim in full was unreasonable under the circumstances because it had no reasonable basis for the refusal, it did not perform a proper investigation, or it did not evaluate the results of the investigation properly; (3) the insurer did not deal fairly and act in good faith with the plaintiff; and (4) the insurer's violation of its duty of good faith and fair dealing was the direct cause of the injury sustained by the plaintiff." *Bailey v. Farmers Ins. Co.*, 137 P.3d at 1264. It is well established in Oklahoma case law that "the insurer does not breach the duty of good faith by refusing to pay a claim or by litigating a dispute with its insured if there is a 'legitimate dispute' as to coverage or amount of the claim, and the insurer's position is 'reasonable and legitimate.'" *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1436 (10th Cir. 1993) (quoting *Thompson v. Shelter Mut. Ins.*, 875 F.2d 1460, 1462 (10th Cir. 1989)).

As evidenced by the undisputed facts, Boots is unable to establish that Essex unreasonably and in bad faith withheld a portion of the payment owed to Boots. Essex maintains it adequately compensated Boots for the portion of the claim related to the March 16, 2013 fire. It is undisputed that the damages resulting from the March 16, 2013 fire are covered under the insurance policy. However, additional water damage that directly resulted from Boots' own contractor's failure to cover the premises is not covered under that policy. The policy states, in pertinent part:

> A. Coverage
> We will pay for direct physical loss of or damage to Covered

> Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

*See*, Insurance Policy, attached hereto as Exhibit 31 at Essex 1171.

The Cause of Loss – Special Form of the insurance policy at issue provides, in pertinent part:

> A. Covered Causes of Loss
> When Special is shown in the Declarations, Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is:
> 1. Excluded in Section B., Exclusions; or
> 2. Limited in Section C., Limitations
>
> C. Limitations
> The following limitations apply to all policy forms and endorsements unless otherwise stated.
> 1. We will not pay for loss or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damages as described and limited in this section.
>    c. The interior of any property or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:
>       (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters.

*Id.* at Essex 1196-1205. Essex's decision to limit the scope of damages was based on its investigation, which revealed that the additional water damage was not a direct result of

the fire. Essex also made multiple attempts to resolve the disagreement as to the scope of damage with Boots. Its failure to do so is not evidence of bad faith.

It is the duty of the insurer to perform "an investigation reasonably appropriate under the circumstances" and to "promptly settle the claim for the value or within the range of value assigned to the claim as a result of its investigation." *Newport v. USAA*, 11 P.3d 190, 195, 2000 OK 59, ¶ 10 (Okla. 2000). If an insurer fails to do so, it may be subject to a claim for bad faith. *Id*. However, "[t]his is not to say an insurer may not negotiate or litigate the value of the claim." *Id.* This duty "merely prevents an insurer from offering less than what its own investigation reveals to be the claim's value." *Id.*

The Oklahoma Supreme Court has recognized "that there can be disagreements between insurer and insured on a variety of matters such as insurable interest, extent of coverage, cause of loss, amount of loss, or breach of policy conditions." *Christian v. Am. Home Assur. Co.*, 577 P.2d 899, 905, 1977 OK 141, ¶ 26 (Okla. 1977). Resorting to a judicial forum to resolve the disagreement "is not per se bad faith or unfair dealing on the part of the insurer." *Id*.; *see also, Deunsing*¸131 P.3d at 137 ("An insurer clearly has the right to resist payment and litigate any claim to which the insurer has a reasonable defense."), *Skinner v. John Deere Ins. Co.*, 998 P.2d 1219, 1223, 2000 OK 18, ¶ 18 (Okla. 2000) ("It is not bad faith to investigate or litigate a disputed claim."). Essex may rely upon its investigation and is not obligated to accept Boots' scope of damages. As discussed above, Essex has a "legitimate and reasonable" basis to disagree with Boots'

position. Thus, this dispute is not bad faith, and Essex is entitled to summary judgment on this claim.

**PROPOSITION II**

**BOOTS IS NOT ENTITLED TO PUNITIVE DAMAGES.**

A plaintiff's claim for punitive damages must be eliminated if "there is no evidence on which the trial court could conclude that [the insurer's] conduct could reasonably be perceived as tortious." *Peters v. Am. Income Life Ins. Co.*, 77 P.3d 1090, 1103, 2003 OK CIV APP 62, ¶ 74 (Okla. Civ. App. 2003). *See*, *Deunsing*, 131 P.3d at 138 ("There can be no punitive damage award where there is no bad faith award."). As discussed above, Boots has failed to provide any evidence to indicate Essex's conduct breached the covenants of good faith and fair dealing. Essex conducted a reasonable investigation of Boots' claim, which justifies its position to limit the scope of damages. Thus, Boots' claim for punitive damages must be disregarded.

"The availability of a punitive damage award in a bad-faith case is not automatic, but rather is governed by the standard applicable in other tort cases." *Buzzard v. Farmers Ins. Co.*, 824 P.2d 1105, 1115, 1991 OK 127 (Okla. 1991). *See*, *Barnes v. Oklahoma Farm Bureau Mut. Ins. Co.*, 11 P.3d 162, 175, 2000 OK 55, ¶ 34 (Okla. 2000); *Newport*, 11 P.3d at 204 ("But clearly, punitive damages do not ipso facto follow from every breach of this duty or in every case [in which] a jury may render a verdict for the wronged party") (quoting *McLaughlin v. National Benefit Life Ins. Co.*, 772 P.2d 383, 385, 1988 OK 41, ¶ 11 (Okla. 1998) (internal quotations omitted)).

Title 23 O.S. § 9.1 requires the plaintiff to prove by clear and convincing evidence "that the defendant acted with oppression, malice, fraud or gross negligence or wantonness." *Id*. *See*, *Miller v. Liberty Mut. Fire Ins. Co.*, 191 P.3d 1221, 1227, 2008 OK CIV APP 65, ¶ 22 (Okla. Civ. App. 2008) ("Under [23 O.S. Supp. 2004 §] 9.1, for punitive damages to be allowed there **must** be evidence, **at a minimum**, of reckless disregard toward another's rights from which malice and evil intent may be inferred.") (quoting *Badillo v. Mid-Century Ins. Co.*, 121 P.3d 1080, 1106, 2005 OK 48, ¶ 66 (Okla. 2005)). Furthermore, "[t]he act which constitutes the cause of action must be activated by or accompanied with some evil intent, or must be the result of such gross negligence – such disregard for another's rights – as is deemed equivalent to such intent." *Newport*, 11 P.3d at 204 (citing *Slocum v. Phillips Petro. Co.*, 678 P.2d 716, 719, 1983 OK 112, ¶ 17 (Okla. 1983)).

In its First Set of Interrogatories, Essex asked Boots to "please state in specific detail each and every fact upon which you rely to support" its allegations of (1) breach of contract (Interrogatory No. 1), (2) bad faith (Interrogatory No, 2), and (3) entitlement to punitive damages (Interrogatory No. 3). *See*, Response of Plaintiff, Boots of Oklahoma, Inc., to the First Interrogatories of Defendant, Essex Insurance Company, pp. 3-11, attached hereto as Exhibit 33. Boots' response to these interrogatories is identical. Boots alleges delayed restoration of the building, Essex's refusal to pay Boots what Boots believes it is entitled to under the terms of the policy, and lack of communication with Boots as to the status or issues with the claim. However, its responses fail to support

Boots' allegations that "the actions of [Essex] were deliberate, intentional, willful, malicious, and in reckless disregard of the rights of Boots." Further, the documents do not support the allegations of delay and lack of communication.

The undisputed facts clearly show that Essex's independent investigation provided a legitimate and reasonable basis for its decision to limit the scope of damages. Essex investigated Boots' claim within one day of receiving notice of the loss. Essex performed an in-depth investigation to determine the value of the claim, which was supported by an independent engineer's reports. Additionally, Essex's independent adjustor held several meetings with Boots' contractor in an attempt to resolve the parties' disagreements. Finally, Essex promptly paid Boots the amount its investigation confirmed was owed for the claim, while still providing Boots the opportunity to present supporting documentation for any additional funds it believed were due.

Although the parties disagree as to the amount due for the claim, Boots has provided no evidence establishing that Essex's position is malicious or accompanied with an evil intent. Thus, Boots cannot meet its burden and punitive damages cannot be awarded.

## CONCLUSION

WHEREFORE, based on the above arguments and authorities, Defendant, Essex Insurance Company, respectfully requests that this Court enter partial summary judgment in its favor on Plaintiff's claims of bad faith and punitive damages.

Respectfully submitted,

*/s/Amy Sherry Fischer*

Larry D. Ottaway, OBA No. 6816
larryottaway@oklahomacounsel.com
Michael T. Maloan, OBA No. 15097
michaelmaloan@oklahomacounsel.com
Amy Sherry Fischer, OBA No. 16651
amyfischer@oklahomacounsel.com
FOLIART, HUFF, OTTAWAY & BOTTOM
201 Robert S. Kerr Avenue, 12th Floor
Oklahoma City, Oklahoma 73102
Telephone: (405) 232-4633
Facsimile: (405) 232-3462

**ATTORNEYS FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of December, 2014, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

J. John Hager, Jr.
The Law Office of J. John Hager, P.C.
3233 East Memorial Road, Suite 101
Edmond, Oklahoma 73013

*Attorney for Plaintiff*

*/s/Amy Sherry Fischer*